We will hear argument in the case of Gollehon v. Mahoney. Counsel for the appellant. If it pleases the Court, Counsel, I'd like to reserve ten minutes of my time, Your Honor, if that's okay. You certainly may do so. Just watch the clock. I will. Thank you. Your Honors, given the complicated nature of what we need to discuss here today, I think it's a fair inference that there might be a lot of places to start. And I've selected one, so unless the Court has an objection, I mean, I'm willing to go whatever certainly direction the Court wants to go. But I've picked something that I think is pretty important. And it has to do with the connection between or the supposed connection between the double jeopardy claim and this fair notice claim. I think that the district court, at least in the background discussion in the order somewhere, that denies this notice claim. There's a suggestion that this Court's resolution of the double jeopardy claim somehow compromises, truncates, lessens the impact of this claim. And I think that Respondent actually kind of makes that as an argument. Well, how much of this is before us at this point? As I recall, we resolved all issues except one, remanded it to the district court, and we're back up on that one narrow issue. How would you define that issue? Well, the issue for discussion today is whether or not there are debatable claims with respect to this due process notice issue that warrant encouragement and should proceed further. And by that, I mean being taken to full briefing and argument, if necessary. But isn't it more narrowly defined as whether the decision of the Montana Supreme Court was so unexpected and indefensible as to constitute a violation of due process? In other words, the opinion which held that the crime did have the death penalty by construing the statute. Well, I think that if we want to talk about the merits of the claim, that probably identifies the claim pretty well, yes. All right. And I think that's what was argued to judge level. All right. But I do, and I'm going to get in and out of this point. I don't want to belabor it. But apparently the reasoning is, with respect to the double jeopardy claim, that since in the context of that claim we had to figure out whether the offenses were the same, and indeed we did determine that the offenses were the same, or at least the court did determine that the offenses were the same, that as some kind of legal proposition, this claim is foreclosed. And the seductive power of that reasoning is because when the Montana Supreme Court or the, I think more appropriately, the Montana legislature makes the judgment about definition of offenses, they're working within a, at the apex of their power. So it has a lot of sort of surface appeal, this argument, that, you know, everybody would have known. The offenses were the same for double jeopardy purposes. The citizenry at large would have known. There's nothing unexpected about the result here. And I'd just like to delve into that suggestion. Counsel, excuse me, counsel. Can you hear me? Yes, Your Honor. I can. Is this different for you? Are we one step removed from that at this hearing, though? Aren't we supposed to be addressing the question about whether reasonable jurists could debate? Yes. Whether your client was on their notice? Yes. I think that's exactly right. So to complete the thought, though, and I think I'm going to get there in just a second, Your Honor. To put this in perspective, this notice claim here is a function of time. It really is a function of time. And it also addresses the power of the legislature to define the penalty for the crime, things that really weren't addressed in the double jeopardy context. Mr. Donahoe, if we would get away from legal theories and just look at the case, I gather your position is if one person beats him to death with a baseball bat, that person knows he's death penalty eligible. If two people beat him to death with a baseball bat, neither knows because you can't determine who struck the fatal blow. Is that clear? No, that's not my question. No, Your Honor, that's not my position. My position is, is that today we need to look at the Montana Supreme Court's decision and probably more appropriately in the first instance need to look at the statutory penalty. In order to decide what? In 1990. In order to decide what notice, what was indicated was the penalty for the offense of accountability for homicide. Should your client have known that death, that he was death penalty eligible? No. Under these circumstances, absolutely not, Your Honor. No. I'm saying is that your position? Is what my position? Why don't you go ahead because you and I aren't going to communicate, I don't think. Okay. Yeah, and it's important to me to try and communicate with Your Honor. Well, I would hope it would be. I would be happy to take another question. Well, the only way you're going to be able to communicate so that is to move to the issue. And what is the issue? Well, the issue today is whether there are debatable questions present on this issue. And there are debatable questions present. On what issue? On the issue of whether or not there was adequate notice that death, the death penalty could be imposed for the offense of homicide by accountability. To get you back to the thing I asked you at first, was there any question that if one person beat somebody to death with a baseball bat, that person would be death penalty eligible? Was there any question ever that that's so? If one person committed deliberate homicide, no question. So this case, the allegation is that two people committed deliberate homicide. Isn't that true? No. The allegation was not that, Your Honor. In this specific instance, the allegation was that the individuals either committed the crime of homicide by accountability or deliberate homicide. And the jury in this case was instructed in that fashion. They were instructed in a manner that said there are two offenses you cannot convict of both. That was the jury instruction. They were broken out in that fashion. So the interesting question presented here is why was the jury instructed in that fashion? And the answer to that question is it's because the legislature enacted laws that permitted that interpretation. But we have a decision of the Montana Supreme Court that went through all of that and made the conclusion. No. And if Your Honor is referring to BDC, I beg to differ. At the four-to-three decision in this case. In this case, the notice in this case was not notice to Mr. Gholahan in 1990. The notice in this case was not sufficient notice because the statutory scheme was sufficiently complex and needed to be sorted out by individual jurists that were capable jurists that reached conflicting opinions with regard to what these statutes said. But I come back to my point. Isn't it true that the Supreme Court of Montana in this case reached a contrary result? The holding of that court was that he was given notice in terms of the existing state of the law of Montana. But in order to abide that conclusion under the terms of the Due Process Notice Clause, we need to look a little deeper. As a raw conclusion, I would agree with Your Honor that the bare majority of the seven justices that passed on this question answered it in the fashion that Your Honor just stated. And isn't that binding on us as an interpretation of State law? We can't revisit State law.  No. And that's why I opened, Your Honor, respectfully, with the double jeopardy question. That's the seductive nature of that analysis. That's where I think Respondent wants to take the Court, and we don't have the luxury of doing that. This is a Federal question that is presented here, and it's this Court's obligation  to look at the legislation and any judicial gloss that was placed on that legislation and also determine when those things happened in time, when those statutes were enacted and when that gloss was placed on those statutes. But that has to be in pursuit of a Federally protected constitutional right. We're not reinventing State law or we're not revisiting State law. He has this individual, Your Honor, respectfully, has a freestanding, independent constitutional right to notice of what the crime is and what the penalty is under the Fourteenth Amendment. And it does not – it's not as circuitous root through some conclusory interpretation of the Montana Supreme Court. Bowie v. City of Columbia says that. So counsel. Your Honor. Counsel, excuse me. So when should – when – at what point in time is the constitutional right of fair notice in play? Should they – are you arguing that they should have been on notice at the time they killed their fellow convict? That would be correct. With a baseball bat. They should have been on notice at that time that for the two of them participating in this murder, they could each be – have the death penalty be imposed. That's correct, Your Honor. At the time the offense was committed. Okay. So the information in this case does say that they could have the death penalty imposed. Yes, Your Honor. And there's nothing that says that in any Montana Supreme Court decision. The allegation itself, the bare allegation, could never serve as sufficient constitutional notice, Your Honor.   There's nothing that says that in any Montana Supreme Court decision. How is someone on fair notice of any law? I mean, are you arguing that your client should have been able to pick up the law books and put the legislation together and come to the conclusion the Montana Supreme Court did? Or, you know, going back to Judge Ferris's first question, I mean, doesn't anyone know if you beat someone up to the point of death with a baseball bat that that's murder? And you could be subject to the death penalty? Yeah. And I understand the import of the Court's question, and I mean no disrespect by this answer. But nevertheless, it needs to be said. I'm not dealing in practicalities here. I'm dealing in legalities. When the notice question arises, it is a legal question of constitutional nature what the legislation provided as notice, not what a prosecutor wrote down on a piece of paper and lodged in court as a charging document. Suffice it to say that if the legislation is not consistent with the allegation, the legislation trumps the allegation. Well, now, as to legalities, don't we have the Montana Supreme Court case? I'm sorry to keep coming back to it, but it seems to me that maybe you're missing a step in this process. Unless you can identify a federally protected right such as was discussed in Bowie, the interpretation of the Montana Supreme Court that essentially existing aiding and abetting law, which predated the incident here, does constitute the notice that you're looking for. All right. Now, I think Your Honor has widened the context here of materials we will consider for the notice. If I understand the Court's question correctly, now Your Honor is bringing in prior decisions, decisions prior of the Montana Supreme Court, to commission of the offense. Is that correct? Well, I'm still focusing on the decision in this case. All right. And obviously, that decision interpreted existing Montana law, which preexisted the event. All right. But I think you're changing the mix here. If you say as a matter of raw notice that the published opinion in this direct appeal in December of 1993 provided the notice, that's one categorical statement. No, no. I hope you don't understand my question to presume that. That's what I'm understanding, Your Honor, saying that the raw notice was given, the constitutional notice was given by virtue of the publication of the direct appeal opinion in 1993. No, no, no, no. What I am suggesting, I'm asking your comment, is didn't the Montana Supreme Court hold that he had notice? In other words, looking at pre-baseball bat incident, the law of Montana was that aiding and abetting and accountability is the same thing, and therefore, the death penalty applies. No, they didn't. And if they did, they were wrong. And if they were wrong, this Court has the authority to correct that, not only the authority, the obligation to correct it. That's my answer to that trilogy of questions. Yes. What prevented your client from knowing that the acts that he committed would make him death penalty? There's nothing in the way of prevention, respectfully, Your Honor, that I need to outline. We're talking about affirmative duties on the part of the State sovereign, Your Honor. And that affirmative duty was to enact legislation that was understandable in the first instance to the reasonable citizen. So what prevented it? So if we could get to that statutory scheme, I could discuss some of the other. You're going to have a hard time answering a question if you don't hear it, aren't you? Are you going to be able to answer it without hearing it? Go ahead, Your Honor. Excuse me, Judge Ferris. First, I just want to say I apologize for not being present in person for such an important case that, well, that I'm on calendar in Pasadena in the next few days. But if everyone would help me out by talking more closely into their microphone, I'd appreciate it. I'm sorry. Thank you. I'm sorry, Your Honor. We will do that, Judge Wardlaw. Thank you. Thank you. And I appreciate, Your Honor, being here in any fashion, video or otherwise. I'm sorry, Judge Ferris. I got distracted there. I'm gathering that you are concerned because your client didn't have notice that the acts that he committed would make him death penalty eligible. Correct. Is that your concern? That's the gist of it. What is it that he needed to know that he didn't know? He needed to know as a broad proposition what the elements of the crime were and what the punishment was. They're the two simple things that the individual needed to know, that any individual, any citizen would need to know in this context. And presumably, that's simply whatever the state law of Montana was at that time. You're not asking that he received a letter in the mail saying, if you participate in killing somebody with a baseball bat, this is what's going to happen to you. No. He needed to know in understandable terms from the legislation that was enacted what the elements of the crime were and what the penalty was. That's my answer to that question. So taking that as a general proposition, where are we going to look? Are we going to look at the charging document? I don't think so. We're going to look at the legislation itself. So let's look at the legislation. Does deliberate homicide statute in Montana circa 1990 tell the individual that he or she can be punished for deliberate homicide by accountability? The answer to that question is categorically no. It does not say that. The substantive law of deliberate homicide, the statutory codified law, does not say that. So where do we look next? We look at the accountability statute, which was the device, the theory that was propounded to convict the individual. Is there any penalty provision within the confines of that accountability scheme, that statutory scheme? The answer to that, again, is categorically no. So we're back to the same starting point. If one person beats him to death, he knows he's death penalty eligible. If two people beat him to death, neither is death penalty eligible, if we follow your logic. It depends on how they're charged, how the jury is instructed. And to complete the thought on the codified law in Montana circa 1990, if you look at the death penalty legislation itself, aggravating circumstances that are required to be proved beyond a reasonable doubt before the death penalty can be imposed, is there anything in that legislation or in this case that said that the individual could be convicted for deliberate homicide by accountability? And the answer to that, again, is categorically no. So if the legislation itself does not admit of a firm definition of what the elements are and what the penalty is, where do we need to go, rhetorically speaking? We need to go to the decisions of the highest court of the State, in this case the Montana Supreme Court. And do you want us to go to the Montana Supreme Court? Was there, but the question is do you want us to look at what the Montana Supreme Court says? I do. I do, and I'm prepared. Well, I misunderstood your argument, because I assume when Judge O'Scannon was asking you about the holding of the Montana Supreme Court, you said no, not that. No. Not that. Now, have you changed your position? No. I think in answer to that question, I wanted some exclusivity. I wanted to remain pointed in the decision that we were discussing, namely the direct appeal in this case. There's no question that as a general proposition for a notice-type issue that's presented here, if the legislation itself does not provide the notice, we must go to the authoritative construction of the Montana Supreme Court. We must find one. There must be an authoritative construction of the statutory scheme that says this is the construction that we give it. If this occurs, the individual is eligible for the death penalty. That did not happen here. There was no such decision circa 1990 when this offense was committed. Counsel, you're down to about nine minutes, and you indicated you want to reserve. I would. I appreciate Your Honor pointing that out. Thank you. We'll hear from the State. Good morning. May it please the Court, my name is John Paulson. I'm an Assistant Attorney General for the State of Montana. I think as the Court has already indicated in its questioning of Mr. Donahoe, the immediate question for the Court is whether Gallahan has made a substantial showing of the denial of a constitutional right, which would entitle him under Section 2253 to a COA. Judge Lovell didn't think so, and so it's his decision to deny the COA that is immediately before the Court this morning. And as the Court indicated in its questioning, the test that is to be applied is the one that was articulated in Slack v. McDaniel, whether the Petitioner, in this case Gallahan, has demonstrated that reasonable jurists, not necessarily reasonable counsel, but reasonable jurists, would find that the district court's claim to the constitutional claim is either debatable or wrong. Now, the application of this COA test necessarily requires an overview of the merits of the constitutional claim. The cases talk about the fact that the Court does not need to give the kind of thorough analysis to the claim that it might otherwise give on the merits, but necessarily the kind of thorough analysis that it would give on the merits of the constitutional claim. And so it's not a question of whether Gallahan has made a substantial showing of the constitutional claim. I believe that the Court has demonstrated that reasonable jurists, not necessarily reasonable jurists, would find that the Court has demonstrated that reasonable   constitutional claim and an writers' right to fair warning that the crime of deliberate homicide when proved through an accountability theory is punishable by the death penalty. I believe that this claim, the analysis of this claim on its merits, requires consideration of the Supreme Court's decision in Bowie, particularly in this regard. In Bowie, the Supreme Court said the due process prohibits the retroactive application of any judicial construction of a criminal statute that is unexpected and indefensible by reference to the law that had been expressed prior to the conduct in issue. And so the Counsel, this is, Counsel, this is where I have difficulty with your argument that the issue isn't reasonably debatable. Because the Montana State Supreme Court that decided this construction of deliberate homicide by accountability was divided. There was, it was a four-to-three decision. I gather one of the judges in the four was not actually a member of the Montana Supreme Court. There had been no prior Montana cases so construing the statute. The Court borrowed from an Illinois statutory scheme for case law to reach the result. So I don't see, though on the merits I might agree with you, I don't see how one can say that it wasn't reasonably debatable at the time. I think what the test requires is for the Court to determine whether or not Judge Lovell's assessment of this claim was reasonably debatable or wrong. Not necessarily what the Montana Supreme Court's assessment was. It should be noted. No, I would agree with you except that I was partially reversed last year by the Supreme Court by not acknowledging that because there were judges on my court that disagreed with me that something was clearly established that there, it was therefore obviously reasonably debatable. All right. I'm not familiar with that case, Your Honor, but I. Well, it's Redding v. Stafford. My colleagues are familiar with it. Okay. I would first point out to the Court that the dissenting opinion of Justice Gray in the Montana Supreme Court's decision in Gallahan's direct appeal does not address the due process, fair warning or fair notice claim that eventually became Gallahan's Claim 7 in this habeas proceeding. What Justice Gray disagreed with is Justice Weber's, the majority opinion's, construction or interpretation of State law with respect to whether accountability homicides are treated for all purposes the same as deliberate homicide. And Justice Weber's argument is that the majority's determination that the aggravating circumstances which made this death-eligible case into a capital case could be found whenever the defendant is convicted under an accountability theory. The due process aspect of her dissent was mentioned in a concluding paragraph in the dissent which quoted from a Montana Supreme Court decision, State v. Goodwin, which contained a lengthy quote from United States v. Bass. It was that quotation which was extracted from Mr. Donahoe's brief that led this Court to find that the issue, the due process issue, had been exhausted, and that's why this Court sent the case back to Judge Lovell for Judge Lovell's consideration of the merits of the due process claim. But I think the focus of the Court with respect to the matter of the COA should be on Judge Lovell's assessment of this claim and not necessarily on the dissenting opinion creating some kind of ambiguity or generating some kind of lack of notice with respect to whether or not the death penalty could be imposed upon someone convicted of homicide by accountability. Well, another part of that decision that troubles me is the question whether the role of the rule of lenity, which is a due process concept, in Golahan's particular case is a reasonably debatable issue, given that there were no prior Montana decisions. The rule of lenity, as the Court is aware, is not per se a constitutional rule, although it has obvious due process aspects. It has its roots in due process concepts. Yes. I would agree that it does, and particularly the due process right to have fair warning or notice of the consequences of one's conduct. But the rule of lenity was found by the Montana Supreme Court not to be applicable because of the Court's conclusion that Montana's statutes were unambiguous. The rule of lenity comes into play only when there is a very serious or significant ambiguity created by the statutes. Montana Supreme Court did not find that ambiguity. Judge Lovell agreed that the Montana Supreme Court was correct in the interpretation of its own law. There's no ambiguity that's present here. I might point out to the Court that the United States Supreme Court recently considered the rule of lenity in a case handed down just last June, Barber v. Thomas, and made it clear that the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute. And no court has found that Montana law rises or descends, I guess, to that level of ambiguity. In fact, as indicated by the Court's earlier questions, the Montana Supreme Court has found that the Montana Supreme Court's interpretation of Montana law, the construction of a Montana statute by the Montana Supreme Court, is, in fact, binding on Federal courts when considering an issue in habeas corpus. Now, I don't think that the due process claim that's raised in Claim 7 just disappears out of deference to the Montana Supreme Court. That doesn't happen. But I think what does happen is that if the Montana Supreme Court says, look at our statutes, these statutes are absolutely clear. Deliberate homicide and deliberate homicide by accountability are one and the same and treated one and the same for all purposes. Accountability is not a separate offense under Montana law. Accountability is simply a conduit or a legislatively authorized method or mechanism for attributing criminal responsibility to an individual for the conduct of someone that he assists in the commission of a crime. Now, you heard Mr. Donahoe's argument, and if I understand it correctly, he suggests that is a post-act interpretation. In other words, that does not constitute the requisite constitutional notice that Mr. Gahlon was entitled to. What's your response? I think the Court, in assessing this claim, has to look at the state of the law at the time that the conduct in question was committed. But the fact that the Supreme Court ruled in the way that it ruled at the point in time after the conduct when the constitutionality, I guess, or the issue of the similarity or the sameness of the deliberate homicide and accountability statutes arose, I think that will – the way the Court interprets whether or not the notice was sufficient is by looking at the law that existed at the time of the conduct. And the statutes, of course, existed at that point in time. But the important point is that, as Judge Lovell recognized, was the Montana Supreme Court's ruling foreseeable, or was it completely indefensible, unforeseeable in light of its previous rulings? And Judge Lovell looked to a couple of decisions by the Montana Supreme Court that were handed down well before the conduct in question in 1990. The BDC case was a juvenile case in which the court, Montana Supreme Court, made very clear that deliberate homicide by accountability is deliberate homicide. A person convicted under an accountability theory is convicted of deliberate homicide. And there's no ambiguity at all in that holding. The court also – In the BDC case, I think I can anticipate Mr. Donahoe's challenge, and that is that maybe that was dictum in the BDC case. What's your response? Your Honor, the question in BDC was whether or not the youth could be transferred into adult court or back to youth court. And that transfer could only occur if the crime committed was deliberate homicide. The youth, BDC, was convicted of deliberate homicide by accountability. And the argument was made similar to the one Mr. Donahoe makes today, that the statute says deliberate homicide. He was convicted under an accountability theory. That's not mentioned. Therefore, the court has no authority to transfer the case to adult court. The Supreme Court rejected that argument. Now, was it dicta? I don't believe so. It was essential to the holding of the case. But at any rate, the court made that announcement. And Judge Lovell continued that line of reasoning with a reference to another case, State v. Powers. In that case, several defendants were convicted under an accountability theory for the death of a small child. The issue of punishment was not specifically raised in that case, but all of the defendants were punished under the punishment provisions for deliberate homicide. And there's no indication from that case that accountability homicides are treated any differently for punishment purposes than are convictions of deliberate homicide itself. So I think the focus, the proper focus of the inquiry for the Court today is upon Judge Lovell's order and whether or not his assessment of this due process claim is debatable or wrong. Judge Lovell made clear, and I think Judge Ferris's questions also make clear, that this was truly a communal crime. This was a crime in which Gallahan acted together in concert with Douglas Turner to beat to death another inmate, Gerald Pelleggi, with baseball bats. And the only real issue for the jury was whether or not they should attribute this death to Gallahan alone or as a joint crime or communal crime with Douglas Turner. Both Turner and Gallahan were found guilty under the accountability theory on count two of the information. And Judge Lovell concluded, as did the Montana Supreme Court, that the acquittal on the deliberate homicide charge, the jury's writing not guilty under count one and accepting the alternative theory under count two, really has no practical or legal significance. I think that's really the point at which the majority of the opinion might be of interest to the Court. I don't know that the same issue, framed more or less the same way, was raised in the companion case of Douglas Turner on appeal. And that decision was handled – was handed down at the same day, same time as the decision in Gallahan's case. In that case, Justice Gray continued her dissenting view with respect to the majority's interpretation of Montana law, but was not joined by Justices Trewiler or Hunt, who signed on with majority resolution of this same issue. I don't have an explanation for that. So that was a six-to-one decision? That was a six-to-one decision. And Justice McDonough, who had recused himself in Gallahan's case, and there was a district judge sitting in his place in Gallahan's direct appeal, Justice McDonough was back on the Court in that case. But at any rate, the Turner case, which considers essentially the same issue, was resolved six-to-one by the Montana Supreme Court on this question of whether or not accountability homicides are death penalty eligible. Counsel, I'd like to just ask another question because of the reasoning of the Montana Supreme Court. And at first blush, it makes – it was persuasive reasoning to me that the majority said, why should anybody get a lesser punishment simply because two people participated in the murder as opposed to one, which would have been the result had Gallahan prevailed in his argument. But I got to thinking about that some more. And, you know, it is true that the accountability statute has no penalties in it. And so you look at the default and the penalty where there is no penalty in the statute is the 10 years. And I don't know if there's anything in the legislative history that backs this up, but – and maybe you can educate me on this – but there is kind of an argument if you don't know for sure that someone actually deliberately killed the victim, maybe there should be a lesser punishment. Your Honor, there are several answers or responses in connection with your question that I'd like to make. First of all, I think a review of the Montana Criminal Code will lead the Court to the conclusion, as it led Judge Legel and the Montana Supreme Court, that accountability is not a separate offense. Accountability is codified in Chapter 2 of Title 45 of the Montana Criminal Code. It's set separate and apart from all the other substantive statutes that define criminal conduct. The accountability statutes are not framed in any sense like a criminal statute. For example, the deliberate homicide statute at issue here, that statute reads, a person commits the offense of deliberate homicide if. And then it lists the elements of that offense. And then in Subsection 2, it lists the specific punishments that are available for someone convicted of deliberate homicide. The accountability statute is not framed that way. It does not say a person commits the offense of accountability if he does X, Y, and Z. Rather, it says a person is accountable for or responsible for the criminal conduct of another person if, under these circumstances, he aids or abets. Subsection 3, I think, is the applicable subsection. The accountability statute is not framed in any sense like a criminal statute.  Rather, it says a person is accountable for or responsible for the criminal conduct of another person if he aids or abets the person in the commission of the offense with the same mental state as the person committing the offense. So accountability isn't like the other, like the inchoate crimes that counsel refers to, like conspiracy attempt or solicitation. Those are offenses, and there is a penalty provision for those. Those are contained in Chapter 4 of Title 45. And the legislature specifically provided that the penalty for those offenses will be the same penalty as for the offense which was attempted or solicited or conspired for. But accountability simply is not an offense, per se. And that's, I think, absolutely clear from looking at the statutes. And if you needed any, if there was any question about it, the Montana Supreme Court resolved it in VDC. Now, the Court's question is, why not look at this default statute as a basis for determining punishment limits in an accountability case? And the reason is that the default statute applies to criminal offenses. Has the default statute ever been applied to a felony case? It has never been, Your Honor. The default statute is a carryover from the years before the criminal code in Montana was revised substantially in 1973. And the Montana Supreme Court has never found an instance, either before or after 1973, in which the default statute applied. It might be interesting to note for the Court that there are two default statutes. One is the one cited by counsel, which says that an offense that is designated a felony should be punished by no more than 10 years. But the preceding statute, Section 212, applies in situations where there is no designation as to misdemeanor or felony, and that provides a maximum of 6 months. Well, accountability, the statute by itself makes no mention of punishment and so doesn't designate whether the offense is a misdemeanor or a felony. Arguably, that earlier statute, the 212 statute, might apply, and the maximum penalty would be 6 months. But the point is, I'm trying to make, is that accountability under a plain reading of the statute is not an offense. It's simply, as the Supreme Court of Montana has held, a conduit, a legislative-created connection that allows the Court to or and a jury to hold somebody responsible for criminal conduct when he acts in a certain way to assist in the commission of a crime. Now, I might point out in response to Judge Wardlaw's question that the degree of participation of an accomplice can vary greatly from crime to crime. And, of course, that's taken into consideration at the point in sentencing. In this case, William Gallahan was a major participant in this crime. I mean, he was, if he didn't strike the fatal blow, he contributed to striking the fatal blow. He and Turner, between them, struck the blows that killed Gerald Pileggi. But as a gauge, and a person that is convicted of accountability under different circumstances, for example, if he was simply the driver of a getaway car where there was an inadvertent homicide, that responsibility or culpability is taken into account at the time of sentencing, and it's probably not a death-eligible case. As Judge Lovell pointed out, and I would argue, I think a better indication of the legislature's intention that accountability homicides are death penalty eligible would be in the mitigation statute in 4618.304. This section of the law concerns the listing of aggravating and mitigating circumstances that are taken into account at the time the death penalty is imposed. And subsection 6 or 7, I think Judge Lovell's order may refer to 7, but I think it's actually 6. Subsection 6 says that it is a mitigating circumstance for the district judge to consider in deciding whether to impose a death penalty, that the defendant was an accomplice with respect to the offense and his participation was relatively minor. I think the only explanation and the only way that you can understand this part of the mitigating circumstance statute is, as Judge Lovell indicated, is the inference that there the legislature knew and intended that accountability homicides or the culpability of an accomplice is an important factor. And in situations where the accomplice's participation was not relatively minor, death penalty may be appropriate and is authorized by Montana law. Counsel, I have a question. Oh, excuse me. Go ahead, Judge Ward. No, you go ahead. Oh, I was just going to ask a procedural question. If we were to grant the COA in this hearing or as a result of this hearing, what happens next? Further briefing? What we would do, I suppose, if we were to grant would be to take it as a full-fledged appeal.    Yes. Is that correct? Yes. There are no other issues that I'm aware of, Your Honor. I think the due process, Fair Notice Claim 7 is the claim at issue here. And although I've probably said as much on the merits that I can say with respect to this claim, either in my pleas before Judge Lovell or on my response here, I suspect Mr. Donahoe may have one additional briefing. And I think that that would be probably suggested or required by the rules. If the Court were to grant the COA, then it would have jurisdiction at that point to consider that. Well, I'm going to ask Mr. Donahoe the same question I just asked you, but go ahead. Yes. Okay. I have one last question. I have one last question. Certainly. Couldn't this all have been resolved by a one-count indictment that simply charged Gholahan with the offense of deliberate homicide as defined in Subsection B of the Deliberate Homicide Statute? Because that statute includes in the definition of deliberate homicide attempt or the person attempts to commit, commits, or is legally accountable for the attempt or commission of, and then it lists all these crimes down to assault with a weapon. So if there had just been a one-count indictment in this case charging deliberate homicide under 45-5102-1B, the jury certainly would have convicted him of that given the correct instruction, and we wouldn't be here. It's possible that a different charging decision by the prosecutor could have eliminated the due process argument that's being made today. But the problem is that there were two, and so that gives Gholahan the argument that he was acquitted of deliberate homicide. It only seems that we are in a little bit of that. I've never seen it come before. I've never seen anything like it before, but I don't see any what's so controversial about it now. When, you kind of, if you just, a plain reading of the statute would seem to include his behavior. Yes, Your Honor. And that really was the aspect of the case that got us going down this road and resulted in the dissenting opinion of Justice Gray. The fact that the case was prosecuted as a deliberate homicide with an alternative theory of accountability. I agree that the felony murder provision, subsection B, possibly could have been used as a basis for the prosecution in this case. I think that, as often is the case, prosecutors make these decisions early in the case, before all the evidence and all the different theories are fully explored. He was originally charged with deliberate homicide, and then the State added the alternative theory of accountability, which was that the State was going to put Gullahan on notice that his, his, that the State's proof is, was going to include evidence of his accountability for the conduct of Turner, simply because the evidence couldn't establish which defendant actually caused the death or did the blow that killed Mr. Pelleggi. Thank you, counsel. Your, your time has expired. It is, it is, Your Honor. Thank you. Very well. Thank you. Mr. Donahoe, you have some reserved time. Let me ask you that question right out of the box. I suppose we could deny the COA or we could grant it and decide it on the merits, or we could grant it just as a solo grant. What happens after that if, in your mind, what, what is there out there that has not been presented to the Court in this proceeding? Well, I think cases change. Well, I guess I should ask this question, Your Honor. Were there three things that you were asking me there, just the denial, the grant? Do you want me to address the denial? Well, well, this is a COA, so we could either grant it. Or we could deny it. Right. If we deny it, it's over. If we could, we grant it, we could grant it, and then what? Or we could grant it and then decide it on the merits anyway. So I'm asking you the question, what is there remaining? If we were to grant the COA, what is there remaining to be determined in this case? Aren't all the issues in front of us right now? I get it. Your Honor, I think that's a fair statement. I think that's a fair statement, but I guess the issues are, but I don't know that the arguments are, and I don't know that they've been fleshed out in their entirety. And I think there are other things to say here. So all I'm saying is, is if there is a grant to say them. There's got seven and a half minutes to say them. Well, if there is a grant, I think it would be necessary and warranted and fruitful to have one final and full round of briefing on the questions presented here. Well, my question is, what would there be in that new round of briefing that we haven't seen already? Well, I think cases change from one court to another. And Judge Levol. But you're in front of the same panel. And, Judge, I understand that. But Judge Levol made a decision, and we're kind of fixated on that right now. But really, some of the merits of the argument that need to be treated, dealt with, deciphered here, go to examination, specific examination of the legislation, what the particular cases said, what powers actually said, what BDC actually said. Counsel, I guess I tend to agree with Judge O'Scanlan. In order to prepare for this argument today, we've had to read all those cases. Name one additional argument or avenue of research that you would want to do to bring to our attention. I don't think it's necessarily the research, Your Honor. I think it's, more appropriately, the sequence. And I think we have to recognize that the district court, in the nature of this proceeding, I tried to keep this motion pretty brief when I made the application for COA. I think we have to recognize that the district court, sua sponte, denied the COA. So I was put to the task of coming and making the application by motion. I think motion is substantively different or at least procedurally different from an actual brief. And I think there are other things in organizational details that I could attend to that could make this presentation more effective and more persuasive. Maybe I did something wrong here, but I thought that I was supposed to be a little bit more curtailed in my presentation in the motion itself. And I tried to hit the high points. I beg the court's indulgence and apologize if I did make a mistake there. But it would be my full intention to take each and every aspect of what has been discussed here today, everything that's been brought up in the papers to date, and organize it in a cohesive whole so I could make an effective presentation. So that would be my answer to that question. As far as BDC is concerned, there's a point I'd like to make about that. And I think it's a big point, an important point. Any notice that may have been provided by that decision is corrupted by the fact that there's language in the opinion that says that the individual conspired. And it's in there. It's highlighted in the motion. I go through the text of BDC and indicate that. And the problem with there, I think, is self-evident. If the court's, there's conflating conspiracy with accountability, and conspiracy has a built-in penalty as an inchoate crime, that really doesn't serve as any kind of useful notice. Powers has zero discussion with respect to penalty, and it appears that the individuals were convicted of deliberate homicide in any case. And in conclusion, I just want to say that we just need to view very closely to the statutory text and to the judicial decisions that interpreted that text, circa 1990 at the time of commission of the offense. I am not here asking this Court to upset the ruling of the direct appeal in Mr. Gholahan's case, insofar as what they say the law is with respect to accountability. I'm not saying that. All I'm saying is, is it should not have had prospective effect, given its indefensible nature. A lot of this was wrought by the hands, the own hand of the prosecutor here. The decision to charge in the style that it was charged, I dare say, showed some misgivings on his part as to whether or not the offenses were actually separate or not. And certainly, that's conclusively determined by the fact that the jury instruction that was given to the jury with regard to the two charges conclusively shows that they were treated as separate offenses. There's nothing in the law that categorically states in any jurisdiction in these United States that a state legislature could not assign different penalties to different means of committing one crime. Unless one were to interpret what's going on here to be alternative theories. And I understand that, and that's a fair criticism, Your Honor. However, taking that into account, we must ask, that's why I go back to the top of my argument. This notice argument, in its broader sense, was, is, and always will be a function of time. When did that notice appear? Either in the legislation or in the cases. Or in the legislation and the cases together. And the only time that all of this was joined for decision, and the only time that it was specifically addressed by the Montana Supreme Court, in the most serious of all cases, where the penalty of death can be imposed, was in Mr. Golojan's direct appeal. And there was no decision prior to that direct appeal, by fair inference or otherwise, that would tell an individual that he was subject to the penalty of death for accountability for homicide. There was none. And that being the state of the law, and the fact that the statutes themselves and the schemes admit of some ambiguous intention, there was no other resolution but to give it prospective effect, that rule. So your bottom line is what? We should do what? The bottom line is, is that the court should rule that there was, as a matter of constitutional law, and the notice provision that's embodied in the 14th Amendment, the notice in this particular situation was insufficient on its face. And the death sentence would have to be vacated. The last thing I think I want to say, and I just have a few seconds here. And there was a point made, I think, by my opponent here, that the Montana Supreme Court found that they were unambiguous and plain. And that may be true to a certain extent, those statutes. That may be the finding in the direct appeal. But likewise, the court should look carefully at the fact that there's language in that opinion to the effect that says, the legislature never intended to dilute the responsibility for accountability by assigning such a low penalty as the default penalty. An individual should not Are you making a rebuttal argument? Are you introducing a new point? No, I'm making a rebuttal argument. I'm pointing out another aspect of the opinion that says that the responsibility shouldn't be diluted by looking to the potential penalty. And the language I think specifically used by the Court is, the legislature never intended. Well, what they didn't intend, they didn't say. We're here to determine what the legislature said, not necessarily what they intended, what they said. Thank you, Counselor. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Farris, O'scannlain, Wardlaw